UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION


CANDICE E.,[1]

             Plaintiff,

     v.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,

             Defendant.

Case No. 6:18-cv-01261-YY

OPINION AND ORDER


YOU, Magistrate Judge:

Candice E. ("plaintiff"), seeks judicial review of the final decision by the Commissioner

of Social Security ("Commissioner") denying plaintiff's application for Title II Disability

Insurance Benefits ("DIB") under the Social Security Act ("Act"). This court has jurisdiction to

review the Commissioner's decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).[2] Because

---

[1] In the interest of privacy, this opinion uses only the first name and the initial of the last name of
the non-governmental party or parties in this case. Where applicable, this opinion uses the same
designation for a non-governmental party's immediate family member(s).

[2] All parties have consented to allow a magistrate judge to enter final orders and judgment in this
case in accordance with FRCP 73 and 28 USC § 636(c).

the Commissioner's decision is not supported by substantial evidence, it is REVERSED and REMANDED for further proceedings.

## BACKGROUND

Born in 1972, plaintiff was 40 years old on the alleged onset date. Tr. 82. Plaintiff has past relevant work as a receptionist, medical records clerk, and administrative clerk. Tr. 25.

Plaintiff has been diagnosed with idiopathic hypersomnolence, obesity, sleep apnea, asthma respiratory distress syndrome, depression, type II diabetes, dysthymic disorder, hyperlipidemia, hypothyroidism, anxiety, panic disorder, and adjustment disorder. Tr. 347, 416, 448, 453-54, 647-48, 667.

Plaintiff quit her most recent job because she had exhausted her sick time but was still sick. She was afraid she was going to get fired, which would negatively affect her ability to find another job. Tr. 52, 159. Plaintiff claims to have a weak immune system, causing her to get sick more often and causing her symptoms to last longer. Tr. 42.

## PROCEDURAL HISTORY

Plaintiff filed an application for DIB on September 4, 2014, alleging disability beginning December 18, 2012. Tr. 13. Plaintiff's claim was initially denied on January 27, 2015, and upon reconsideration on May 1, 2015. *Id.* A hearing was held before an Administrative Law Judge ("ALJ") on March 8, 2017, in which the plaintiff testified, as did a vocational expert ("VE"). Tr. 36-66. On May 10, 2017, the ALJ issued a decision finding plaintiff not disabled within the meaning of the Act. Tr. 13-27. After the Appeals Council denied her request for review, plaintiff filed a complaint in this court. Tr. 1-6. The ALJ's decision is therefore the Commissioner's final decision subject to review by this court. 20 C.F.R. § 422.210.

**STANDARD OF REVIEW**

The reviewing court must affirm the Commissioner's decision if it is based on proper

legal standards and the findings are supported by substantial evidence in the record. 42 U.S.C.

§ 405(g); *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007). This court must weigh the

evidence that supports and detracts from the ALJ's conclusion and "'may not affirm simply by

isolating a specific quantum of supporting evidence.'" *Garrison v. Colvin*, 759 F.3d 995, 1009-

10 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007)). The

reviewing court may not substitute its judgment for that of the Commissioner when the evidence

can reasonably support either affirming or reversing the decision. *Parra v. Astrue*, 481 F.3d 742,

746 (9th Cir. 2007). Instead, where the evidence is susceptible to more than one rational

interpretation, the Commissioner's decision must be upheld if it is "supported by inferences

reasonably drawn from the record." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008)

(citation omitted); *see also Lingenfelter*, 504 F.3d at 1035.

**SEQUENTIAL ANALYSIS AND ALJ FINDINGS**

Disability is the "inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of not less than 12

months." 42 U.S.C. § 423(d)(1)(A). The ALJ engages in a five-step sequential inquiry to

determine whether a claimant is disabled within the meaning of the Act. This sequential analysis

is set forth in the Social Security regulations, 20 C.F.R. §§ 404.1520, 416.920, in Ninth Circuit

case law, *Lounsburry v. Barnhart*, 468 F.3d 1111, 1114 (9th Cir. 2006) (discussing *Tackett v.*

*Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999)), and in the ALJ's decision in this case, Tr. 14-15.

At step one, the ALJ found plaintiff had not engaged in substantial gainful activity after December 18, 2012, the alleged onset date.  Tr. 15.

At step two, the ALJ found plaintiff has the following severe impairments: obstructive sleep apnea, idiopathic hypersomnia, type II diabetes, obesity, asthma, major depressive disorder, and anxiety.  *Id.*

At step three, the ALJ found plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment.  Tr. 16.  The ALJ next assessed plaintiff's residual functional capacity ("RFC") and determined that she could perform a reduced range of light work and that:

> She could lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently. She could stand or walk for 2 hours in an 8-hour workday, and she could sit for about 6 hours in an 8-hour workday, with normal breaks. She could never climb ladders, ropes, or scaffolds. She could have no exposure to moving mechanical parts or unprotected height hazards. She could understand, remember, and carry out simple, routine and repetitive instructions that can be learned in 30 days or less. She could have occasional public contact, but could not work directly with the public. She could have occasional direct coworker interaction, but could not engage in group tasks. She could have occasional supervisor contact. She was further limited to low stress work, which is defined as requiring only occasional changes in work setting and work duties and no conveyor belt paced work. She could have no exposure to atmospheric conditions.

Tr. 18.

At step four, the ALJ found plaintiff was unable to perform her past relevant work as a receptionist, medical records clerk, or administrative clerk.  Tr. 25.

At step five, the ALJ found plaintiff could perform jobs that exist in significant numbers in the national economy, including cutter-and-paster, addresser, and laminator I.  Tr. 26.

## DISCUSSION

Plaintiff argues that the ALJ erred by failing to meet her burden at step five and improperly rejecting plaintiff's subjective symptom testimony.

## I.	Step Five Finding

While the claimant has the burden of proof with regard to steps one through four of the sequential analysis, the burden shifts to the Commissioner at step five. 20 C.F.R. § 404.1520. The Commissioner must show that the claimant is capable of making an adjustment to other work after considering the claimant's RFC, age, education, and work experience. *Id*. If the Commissioner fails to meet this burden, then the claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(v). Plaintiff argues that the ALJ improperly concluded that she could perform the jobs of laminator I, cutter-and-paster, and addresser.

### A.	Laminator I

The *Dictionary of Occupational Titles* ("DOT") defines the job of laminator I as follows:

> Tends machine that laminates precemented leather and plastic parts used in making leather products, such as wallets, coin purses, and key cases: Presses button to start conveyor and heating elements. Turns knob to adjust distance between presser rollers. Places aligned parts on conveyor leading to machine that laminates parts. Removes parts from machine and ties parts into bundles for further processing.

*See* DOT, (4th ed. 1991), 690.685-258. Notably, the RFC indicates that plaintiff is precluded from "conveyor belt paced work" and can have "no exposure to moving mechanical parts." Tr. 18. Plaintiff argues that the laminator job is incompatible with the RFC because it involves working with a conveyor and exposure to moving mechanical parts.

"When vocational evidence provided by a VE or VS is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the VE or VS evidence to support a determination or decision that the individual is or is not disabled." SSR 00-4p. Here, there are two apparent conflicts. First, the RFC precludes "conveyor belt paced work," but the reference to a conveyor in the laminator job description indicates that the position likely involves performing at a conveyor belt pace. Second, the RFC's prohibition against moving mechanical

5 – OPINION AND ORDER

parts conflicts with the fact that the conveyor moves through presser rollers, i.e., moving mechanical parts.

The VE attempted to explain the conveyor belt conflict by testifying that laminators "just turn on and off a machine," i.e., they are responsible for "just seeing that the machine is loaded and turned on." Tr. 64. The VE also testified that it was not like the "Lucille Ball thing," presumably referring to an infamous episode of a television show where candy comes down a conveyor belt at an absurd pace. Tr. 65. However, it is implausible that a full-time position would require nothing more than turning a machine on and off, and relying on a fictional television show for comparison is not persuasive evidence. *See Johnson v. Shalala*, 60 F.3d 1428, 1435 (9th Cir. 1995) ("[A]n ALJ may rely on expert testimony which contradicts the DOT, but only insofar as the record contains persuasive evidence to support the deviation.")

The Commissioner argues that the RFC precludes conveyor-belt-paced work, but not all work involving a conveyor belt. Def. Br. 4, ECF #12. However, when closely examined, this is a distinction without a difference. The DOT states that the laminator "[p]laces aligned parts on [the] conveyor" and "[r]emoves parts from [the] machine and ties parts into bundles for further processing." *See* DOT, (4th ed. 1991), 690.685-258. Otherwise stated, the laminator places objects on the conveyor belt and removes objects from the conveyor belt. To place and remove objects on a moving conveyor belt, one presumably must work at the *pace* of the conveyor belt.

The VE also failed to supply any explanation for the conflict regarding moving mechanical parts. As noted above, the laminator job description references exposure to moving mechanical parts. Because the VE provided no explanation for this deviation, the ALJ's determination that plaintiff can work as a laminator is not based on substantial evidence.

In her responsive brief, the Commissioner also failed to address the mechanical parts

inconsistency. The Commissioner's failure to respond is effectively a concession of this issue.

*See Bolbol v. City of Daly City*, 754 F.Supp.2d 1095, 1115 (N.D. Cal. 2010) ("[P]laintiff fails to

address this issue in her opposition brief and apparently concedes that she may not proceed on

this claim. Accordingly, the court grants summary judgment in favor of defendants as to this

claim"); *see also Steger v. Peters*, No. 6:16-cv-02093-YY, 2018 WL 3430671, at *2 (D. Or. Jul.

16, 2018) (finding plaintiff conceded dismissal of a claim on the merits by not responding to the

motion for summary judgment); *Ward v. Nat'l Entm't Collectibles Ass'n, Inc.*, No. CV11-06358-

MMM(CWx), 2012 WL 12885073, at *10 (C.D. Cal. Oct. 29, 2012) (by failing to oppose

defendants' motion for summary judgment on damages claim, plaintiff abandoned right to seek

such damages). For these reasons, the ALJ erred in finding that plaintiff was capable of

performing the laminator I job.

**B.      Addresser and Cutter-and-Paster**

Plaintiff argues that the ALJ's step five finding was erroneous because the jobs of

addresser and cutter-and-paster are obsolete. This court agrees.

The DOT states that an "addresser" performs the following functions: "[a]ddresses by

hand or typewriter, envelopes, cards, advertising literature, packages, and similar items for

mailing." DOT, (4th ed. 1991), 209.587-010. A "cutter-and-paster" does the following: "[t]ears

or cuts out marked articles or advertisements from newspapers and magazines, using knife or

scissors," and then records the publication date and other information on the clipping. DOT, (4th

ed. 1991), 249.587-014. Notably, in 2011, the Commissioner released a study that, in discussing

the jobs of addresser and cutter-and-paster, acknowledged "[i]t is doubtful that these jobs as

described in the DOT, currently exist in significant numbers in our economy." Study 7, ECF #9-1.

The Commissioner argues that the study is outside the record and plaintiff therefore cannot rely on it. Def. Br. 4, ECF #12 (citing 42 U.S.C. § 405(g)). Nevertheless, plaintiff relied on the study before the Appeals Council and plaintiff's unchallenged summary of the study's findings is included in the record. *See* Tr. 342. The Commissioner does not argue that plaintiff's summary of the study findings is inaccurate. Moreover, a number of districts have relied on the same study to conclude that the jobs of addresser and cutter-and-paster are obsolete. *See Scott v. Colvin*, No. 14-cv-04051-EDL, 2015 WL 11438598, at *13 (N.D. Cal. Dec. 9, 2015); *Burney v. Berryhill*, 276 F. Supp. 3d 496, 500 (E.D.N.C. 2017); *Read v. Commissioner, Soc. Sec.*, Civ. Case No. GJH-15-2684, 2016 WL 2610117, at *5 (D. Md. May 6, 2016); *Skinner v. Berryhill*, No. CV 17-3795-PLA, 2018 WL 1631275, at *5-6 (C.D. Cal. Apr. 2, 2018).

In any event, the court need not rely on the study to conclude that the addresser and cutter-and-paster jobs, as described in the DOT, are obsolete. Substantial evidence is "such relevant evidence as *a reasonable mind* might accept as adequate to support [the ALJ's] conclusion." *Orn v. Astrue,* 495 F.3d 625, 630 (9th Cir. 2007) (emphasis added) (citations omitted). For example, in an unpublished opinion, the Ninth Circuit found that "[a] reasonable mind would not accept that the VE's testimony that there are 3,600 head dance hall hostess positions in the local economy and 342,000 in the national economy." *Farias v. Colvin*, 519 F. App'x. 439, 440 (9th Cir. 2013) (cited pursuant to Ninth Circuit Rule 36-3).[3] Here, the VE

---

[3] While unpublished decisions by the Ninth Circuit are not binding, they may be indicative of how the court would rule in a published opinion. *Ruth v. Berryhill*, No. 1:16-CV-0872-PK, 2017 WL 4855400, at *11 n.12 (D. Or. Oct. 26, 2017) (citation omitted).

testified that there are 20,051 cutter-and-paster jobs in the national economy. However, a

reasonable mind would doubt this testimony because "since 1991 the use of computers has

become increasingly common in the work environment, likely reducing the need for the physical

press clipping task." *Scott*, 2015 WL 11438598, at **12-13 (holding that a reasonable mind

could not accept VE testimony that there were 640 cutter-and-paster jobs in California).[4]

The same reasoning applies to the addresser position. In *Skinner*, the court explained

that:

> it is not unreasonable to assume that the occupation of 'addresser,' which—as
> described by the DOT—provides for addressing envelopes *by hand or by
> typewriter*, is an occupation that has significantly dwindled in number since 1991
> in light of technological advances. That being the case, a reasonable mind would
> not accept the VE's testimony that there are over 3,000 such positions in the
> region of California alone, or even that there are over 10,000 in the national
> economy.

2018 WL 1631275, at *6 (emphasis in original).

Here, the VE testified that there are over 11,000 addresser jobs in the national economy.

However, as explained in *Skinner*, a reasonable mind would not accept that addresser jobs exist

in such numbers. *Id.*; *see also Read* 2016 WL 2610117, at *6 (holding that given the nature of

the cutter-and-paster and addresser jobs, "a reasonable person would question whether even

small numbers of those positions remain available in the United States"). Accordingly, the ALJ

erred in relying on the VE's testimony that plaintiff could perform the jobs of addresser and

cutter-and-paster.

The Commissioner argues that even if the jobs of addresser and cutter-and-paster are

obsolete, the ALJ's opinion was still supported by substantial evidence because plaintiff can

perform the laminator job. However, as discussed above, the ALJ erred in concluding that

---

[4] The DOT was lasted updated in 1991.

plaintiff could perform the laminator job. Therefore, the ALJ's step five finding was not supported by substantial evidence.

## II.     Subjective Symptom Testimony

Plaintiff alleges that the ALJ wrongfully discounted her subjective symptom testimony. When a claimant has medically documented impairments that could reasonably be expected to produce some degree of the symptoms complained of, and the record contains no affirmative evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of . . . symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996) (citation omitted). A general assertion that the claimant is not credible is insufficient; the ALJ must "state which . . . testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). The reasons proffered must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (internal citation omitted). If the "ALJ's credibility finding is supported by substantial evidence in the record, [the court] may not engage in second-guessing." *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (citation omitted).

Effective March 28, 2016, the Commissioner superseded Social Security Ruling ("SSR") 96-7p, governing the assessment of a claimant's "credibility," and replaced it with SSR 16-3p. *See* SSR 16-3p, *available at* 2016 WL 1119029. SSR 16-3p eliminates the reference to "credibility," clarifies that "subjective symptom evaluation is not an examination of an individual's character," and requires the ALJ to consider all of the evidence in an individual's record when evaluating the intensity and persistence of symptoms. *Id.* at *1-2. The ALJ must examine "the entire case record, including the objective medical evidence; an individual's

statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.* at *4.

### A. Inconsistent Statements

The ALJ found that plaintiff's statement "regarding her need to sleep 12 to 14 hours [was] inconsistent with her contemporaneous reports to providers that she slept only 10 to 11 hours per day with medication compliance." Tr. 19. A review of the record reveals that the only time plaintiff reported she slept 10 to 11 hours per day was at a single appointment in September 2014. Tr. 607. At that time, Dr. Goldner recommended that plaintiff take one or two 20-minute naps per day and increase her sleep time as needed. Tr. 608. After plaintiff got sick in October 2014, her hypersomnolence worsened, and in April 2015, she was sleeping seven to ten hours at night, waking up at 7:30 AM, but then going back to sleep later in the morning and sleeping until the afternoon. Tr. 604. She also took frequent naps. *Id.* Accordingly, plaintiff's testimony in March 2017, that she slept 12 to 14 hours per day, is not inconsistent with her reports from September 2014 that she was sleeping 10 to 11 hours per day. Tr. 43, 607. Indeed, the record reflects that plaintiff slept 10 or 11 hours per day only for approximately one month. Tr. 604.

The ALJ also found that plaintiff initially estimated that she spent only two hours a day, four days a week providing homeschool instruction to her son, "[h]owever upon further questioning, she admitted to spending 2 additional hours at a homeschool co-op with her son, and she took him to the gym for physical activity." Tr. 19. Plaintiff's statements are not inconsistent. Plaintiff stated that she oversees her son's education two hours per day, four days per week. Tr. 46. She further explained that at the co-op, "he takes coding and geology class, [and she does not] have to do anything." *Id.* Additionally, to the extent that taking her son to the

gym for exercise could qualify as overseeing his education, plaintiff explained that when she takes him to the gym, she just sits.  Tr. 56.

### B.      Activities of Daily Living

An ALJ may invoke activities of daily living in the context of determining symptom allegation credibility to (1) illustrate a contradiction in previous testimony, or (2) demonstrate that the activities meet the threshold for transferable work skills.  *Orn*, 495 F.3d at 639.  The ALJ found that plaintiff's ability to maintain personal care, prepare simple meals, do laundry, wash dishes, vacuum, perform yard work, drive, shop, manage her finances, and care for her son were inconsistent with her alleged need to sleep 14 hours per day.  Tr. 19.  It is not clear how those activities are inconsistent with plaintiff sleeping 14 hours per day, and as the ALJ noted in the next paragraph:  "[E]ven if [plaintiff] needed to sleep for 14 hours a day, there are still 10 hours remaining in the day[.]"  *Id.*

Moreover, plaintiff reported that she only prepares meals once per week and that she could only spend a total of four hours per day on other household chores, "separated by frequent rest breaks."  Tr. 250-51.  She explained that her husband helps with "cooking, laundry, grocery shopping, vacuuming, cleaning, [and] yard work," does most of the driving, helps care for their son, and does homeschooling  Tr. 45-46, 251.  Additionally, plaintiff moved in with her parents, who also help with household chores.  Tr. 49.

The ALJ further found that plaintiff's ability to get along with others, leave the home by herself, and manage her hygiene and appointments without reminders was inconsistent with her reports of anxiety and poor memory.  Tr. 19.  The ability to maintain personal hygiene, get along with others, or leave home alone are not inconsistent with having anxiety or poor memory.  Moreover, while plaintiff could manage her appointments without reminders, she needed

reminders to take her medication. Tr. 250. Treatment notes also corroborate that plaintiff had difficulty with memory. Dr. Erickson noted that plaintiff's memory was "not very good," and several other doctors repeatedly assessed that her memory was fair. Tr. 647, 663, 667, 670, 673, 676, 680, 683.

Later in the decision, the ALJ referenced the same activities listed above, in addition to plaintiff's ability to read, play games, swim, hike, walk, search the internet, watch TV, socialize with friends and family, and go on family vacations, finding that such activities "undermine [plaintiff's] assertions related to the intensity, persistency, and limiting effects of her physical and mental health symptoms." Tr. 22. As discussed above, the ALJ overstated a number of plaintiff's activities. Moreover, to properly discredit a claimant, "[t]he ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion." *Smolen*, 80 F.3d at 1284 (citing *Dodrill*, 12 F.3d at 918). Here, the ALJ did not indicate which symptom testimony was contradicted by plaintiff's activities; rather, the ALJ included a vague boilerplate statement. Therefore, the ALJ's finding was insufficient as a matter of law.

###     C.     Reason for Leaving Most Recent Employment

The ALJ found that plaintiff "alleged she stopped working . . . due to her medical conditions, including lack of sleep and frequent illnesses" but that "there is no basis or justification for this assertion in the evidence of record." Tr. 20. However, the record contains ample evidence that plaintiff stopped working due to her health problems. Around the time that plaintiff quit her job, she had been sick with strep throat and bronchitis for about two weeks. Tr. 563. Plaintiff was so sick that she was unable to "keep any medications down," and she was seen in urgent care twice. Tr. 563, 702. Plaintiff reported her viral illness had "been

progressively worsening 'due to stress from [her] work'" and that she reached a breaking point and put in her two weeks' notice. Tr. 701. In short, she was "quitting [her] job so she [could] concentrate on her health." Tr. 563. Indeed, the record reflects that plaintiff missed nearly 30 days of work in 2012 due to illness. Tr. 159, 197-98, 200, 202, 213, 215, 217-18. Plaintiff missed 12.5 days of work in just the last two months before she quit. Tr. 217-18. Accordingly, the record reflects that plaintiff quit her job due to her health problems.

The ALJ also found that plaintiff's "allegations of a poor immune system and frequent episodes of bronchitis for the last 15 years are simply not supported by the longitudinal medical evidence of record." Tr. 20. Notably, the record does not contain records dating back 15 years. Nevertheless, the more recent records demonstrate that between December 2012 and September 2014, plaintiff had bronchitis at least five times. Tr. 463, 503, 508, 563, 670. Plaintiff also had pneumonia that lasted about a month in April 2015, and weeks later, she was still recovering and her voice was still hoarse. Tr. 649. This supports plaintiff's claim that she has a poor immune system and frequent episodes of bronchitis.

Finally, the ALJ found that plaintiff quit working due to a "desire to 'transition to a housewife role.'" Tr. 20 (citing Tr. 675). However, a review of the record reveals that plaintiff did not express a "desire" to transition to a housewife role; rather, she reported that she felt she was "burdening her family financially since she has transitioned to a housewife role." Tr. 675. Furthermore, as discussed above, there is clear evidence in the record that plaintiff quit her job due to her health problems.

**D.      Looking for Work**

The ALJ also relied on the fact that plaintiff continued to look for work. Tr. 20. However, the mere fact that plaintiff attempted to find a job is insufficient to discredit her. *Webb*

*v. Barnhart*, 433 F.3d 683, 688 (9th Cir. 2005) ("That [the claimant] sought employment suggests no more than that he was doing his utmost, in spite of his health, to support himself."); *see also Lingenfelter v. Astrue*, 504 F.3d 1028, 1038-39 (9th Cir. 2007) ("Under these circumstances, it is at least as likely that the claimant tried to work in spite of his symptoms, not because they were less severe than alleged."). Here, as in *Webb*, the record reflects that plaintiff was struggling financially and was doing her best to support herself. Tr. 600 (treatment note reflecting that she and her family had to move in with her parents to save money); Tr. 660 (explaining that she felt like she had to go back to work for "financial reasons"); Tr. 675 (reporting that she was burdening her family financially by staying home); Tr. 696 (reporting financial difficulties).

The ALJ additionally noted that plaintiff had set the goal of returning to school. Tr. 20. However, the mere aspiration of returning to school is not inconsistent with disability. Despite her hopes, there is no evidence that plaintiff was able to return to school. Therefore, plaintiff's search for work and goal of returning to school are not clear and convincing reasons for discounting her testimony.

### E.      Past Ability to Work

The ALJ found that "the fact [plaintiff's] allegedly disabling impairments were present at approximately the same level of severity prior to the alleged onset date and did not prevent her from working suggests those impairments would not currently prevent work." Tr. 20. The ALJ cited plaintiff's reports that she had always slept a lot even as a child and that she has had sleep problems her whole life. Tr. 660, 685. However, the fact that plaintiff always slept a lot or has had sleep problems does not establish that her symptoms were always present at the same level of severity.

### F.     Conservative Treatment

The ALJ found that plaintiff's medications were often refilled without change, she was never hospitalized for any significant period, "and her impairments have not received more aggressive forms of treatment, such as surgery." Tr. 22. The record reflects that the cause of idiopathic hypersomnia is unknown and that its treatment is symptomatic. Tr. 333. Modafinil is first on the list of drugs for treating hypersomnia. *Id.* Therefore, it is logical that plaintiff was continually prescribed Modafinil. Furthermore, there is nothing in the record to indicate that extended hospitalizations or surgery would be appropriate treatments for hypersomnia.

Moreover, the record reflects that plaintiff was regularly prescribed more than a dozen different medications for her various conditions, including several for hypersomnia. Tr. 407-08, 410-11, 449-50, 455-56, 458-59, 504-05, 574-75. Accordingly, the purported conservative treatment is not a clear and convincing reason for discounting plaintiff's testimony.

### G.     Effective Treatment

The ALJ discredited plaintiff's testimony regarding her hypersomnia because "she was prescribed medication and consistently reported improved sleep with medication compliance." Tr. 20. In support, the ALJ cited a treatment note that indicated plaintiff's cough stopped after she discontinued one of her kidney medications. Tr. 373. It is unclear what a treatment note pertaining to plaintiff's cough and kidney medication has to do with plaintiff's hypersomnia treatment. The ALJ also relied on August 2015 treatment note in which plaintiff reported that overall, she had been doing well with medication. Tr. 600.

Plaintiff argues that while she experienced minimal improvement on medication, her symptoms were not effectively controlled. Pl. Br. 29, ECF #9. Indeed, there is some ambiguity in the record as to the effectiveness of plaintiff's medication. In March 2014, plaintiff reported

that she was sleeping better and not sleeping in as much on Provigil.[5]  Tr. 669.  The next month,

plaintiff reported an overall improvement in her sleep schedule since starting Provigil.  Tr. 667.

However, in May 2014, plaintiff reported that while Provigil had "helped her sleepiness

somewhat," "she continue[d] to have real issues with fatigue and continue[d] to be capable of

sleeping for many hours at a time."  Tr. 611.  Later that month, she reported that her energy

levels were better on Provigil.  Tr. 662.  In early June, plaintiff reported that Provigil "was not

helping her very much."  Tr. 610.  At the end of June, Dr. Erickson noted that Provigil had been

helpful.  Tr. 660.  Three months later plaintiff reported that her hypersomnia was improved with

medication.  Tr. 607.  The following year, in June 2015, plaintiff reported that she was sleeping

adequately.  Tr. 649.

     If evidence presents the possibility for multiple interpretations and the Commissioner's

decision is rational, the decision must be affirmed because "the court may not substitute its

judgment for that of the Commissioner."  *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir.

2001).  Here, the ALJ's finding that plaintiff's medication was effective in controlling her

symptoms was a rational interpretation of the evidence.  Thus, it was proper for the ALJ to

discount plaintiff's testimony on that basis.

### H.    Non-compliance with Treatment

     The ALJ discredited plaintiff's testimony because she "consistently admitted to

medication noncompliance" and "[s]uch failure to follow through with treatment and doctor

recommendations suggest her symptoms of fatigue and hypersomnia may not be as serious as

---

[5] Modafinil is alternatively referred to as Provigil.  Tr. 577.

alleged." Tr. 20.  Indeed, while plaintiff was directed to take Provigil one to two times *per day*,

she acknowledged that she had only been taking her medication one or two times *per week*.

Tr. 603-04.

There is some evidence that plaintiff was unable to consistently take Provigil due to her

bronchitis.  Tr. 670.  This could justify plaintiff's non-compliance during periods she was

suffering from bronchitis.  However, during the period cited by the ALJ—during which plaintiff

was only taking Provigil one to two times per week instead of the prescribed one to two times

per day—plaintiff did not have bronchitis.  Tr. 603-04.  Therefore, the ALJ properly relied on

plaintiff's non-compliance with treatment.

In conclusion, while the court finds that many of the rationales relied on by the ALJ were

not clear and convincing reasons for rejecting plaintiff's symptom testimony, those errors were

harmless because effective treatment and plaintiff's non-compliance with treatment constitute

clear and convincing reasons to discredit plaintiff's symptom testimony.  *See Batson v. Comm'r*

*of Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2004) (the ALJ's overall credibility decision

may be upheld even if not all of the ALJ's reasons for rejecting the claimant's testimony are

upheld.).

## III.     Remand

Because the Commissioner failed to meet the step-five burden of establishing that

plaintiff can perform other work in the national economy, the case must be remanded for the ALJ

to solicit new testimony from the VE as to whether there are other jobs in the national economy

that plaintiff can perform.  *See Treichler v. Comm'r Soc. Sec. Admin.*, 775 F.3d 1090, 1105 (9th

Cir. 2014) (holding that a remand for proceedings is appropriate where the record is not fully

developed).

Furthermore, there is an additional unresolved issue with regard to the VE testimony. The VE testified that if plaintiff missed more than one day per month, she would not be able to maintain gainful employment. Tr. 61-62. The record reveals that in the final 15 months of plaintiff's employment, she was missing on average more than two days per month. Tr. 159. If plaintiff's performance over that period represents what she was capable of during the relevant period, then she would be disabled. However, the record does not contain a medical opinion that explicitly addresses how many days plaintiff would miss in an average month. Notably, Dr. Lewy concluded that plaintiff was moderately limited in her ability to maintain regular attendance, but did not specifically address how many days per month she would miss. Tr. 95.

Accordingly, to address this issue on remand the ALJ shall order a consultative medical examination to review plaintiff's medical records, perform an examination of plaintiff, and assess plaintiff's functional limitations, including the number of days in an average month that plaintiff would be expected to be absent from work as a result of her impairments.

## CONCLUSION

For the reasons discussed above, the decision of the Commissioner is REVERSED and this matter is REMANDED for further proceedings. On remand, the ALJ must (1) order a consultative medical exam as described above, (2) obtain additional VE testimony regarding what work plaintiff can do, if any, and (3) conduct any additional proceedings as indicated by the results of the foregoing instructions.

DATED June 20, 2019.

/s/ Youlee Yim You
Youlee Yim You
United States Magistrate Judge